Bruce et al. Mr. J. Dowling for the appellant. Mr. Sean Cronin for Addison. Mr. Porter is another appellee and no one is appearing on his behalf so you have the entirety of the argument. So you may proceed Mr. Dowling. This is a community interest fight. More precisely it's a neighborhood fight. It has its origins going back to 1999 on the first recording of the final plat of the subdivision by Ralph Walpacher who was the developer. At that time, on June 3, 1999, not only filed the final plat of the subdivision, he also filed restrictive covenants that went along with that final plat. The whole purpose of that plat and the restrictive covenants were, of course, to develop a community where land values were preserved, certain building restrictions were preserved, essentially to create a cohesive neighborhood. Between June 3, 1999 and roughly November 28, 2001, a lot of the lots were sold. This is a 46 lot subdivision and technically 47, one of the lots is a boat, lots 5 through 26 are on the lake itself. The rest of the lots are surrounding the rest of the subdivision. There's also a tennis court that was platted and, of course, they have the other communities and some common areas, entryways, that type of thing. On November 28, when the original plat was filed and the original restriction was filed, there was a reservation of right to amend the restrictive covenants retained by the New Alpert on a per lot basis. On February, excuse me, on November 28, 2001, Mr. Waldocker comes forward and he decides he's going to amend the restrictive covenants that were filed back in June of 1999. And there are the November 28, 2001 restrictions that were filed. Now, significantly what happens on November 28, 2001, is Mr. Waldocker not only signs them as a developer, he then signs them individually for lots that have been, that remain unsold as of that date. Significantly, lot 13, which is the Porter's lot, and they are here today, was one of those lots on which the developer signed because that was still an unsold lot. Additionally, and I will tell you to some degree for an unknown reason, because of the reservation of rights, but several of the other lot owners also signed the restrictive covenants on November 28, 2001. In fact, with the exception of Mr. Haney, who is one of the appellants here, or at least here, and defendants, all of the other defendants signed the restrictive covenants on November 28, 2001. Those were subsequently filed. On December 2, 2001, there was an association, the Briars Homeowners Association had a meeting, and they adopted those, they adopted bylaws, and of course the restrictive covenants, and then they started to proceed. How important is it that there was no incorporation until sometime in 2002? I don't know that it's necessarily significant in this particular case for a couple of reasons. One, obviously February 26, 2002 is when the association comes to light, actually is formed. The original plat in 1999 clearly calls for a homeowners association. In fact, it sets out in its notes several, and those are in my brief as well, but it sets out several passages as to the existence of that association and the duties that they're going to have. So in essence, what you have is a voluntary association of homeowners as of December 2, 2001, and they subsequently incorporate. In fact, one of the cases that is cited by the defendants in this particular case, the Scott case, kind of addresses that. They were trying to say, look, you didn't form the articulation right, you didn't follow the articulation, section 902.35, but in that case, at the very end of that case, what it says is, because you didn't file it right, we're going to say you're not an incorporation, but you were a voluntary association until such time, and that's going to exist until such time as you can create the incorporation. The incorporation will subsequently then form, at least file, I would say, on February 26, 2002. The affidavit of Mr. Wagner clearly evidences that at the meeting on November, or excuse me, December 2, 2001, there was a vote, it was a unanimous vote to incorporate, and then they filed all of the paperwork necessary through now Judge Loveno to finish the incorporation process. Additionally, once they are incorporated, there's case law I cited here, the corporate acts that have occurred prior to the incorporation, the ultra-virus acts, can be ratified and adopted by the subsequent act of the then-formed corporation, as well as its officers, and of course, the course of conduct. And essentially, this is what you have here, and this is what leads to this fight. From 1999 to 2001, they're operating under the 99 Restrictive Covenants, and for all intents and purposes, everybody's getting along fine. November 28, 2001, Ralph Walbacher, who's the developer, transfers all of his rights in the common areas to this association, transfers the obligation of the Restrictive Covenants to maintain all of the common areas, including the earth and dam and the lake and everything else, to the association. Now, stop there. Do they have to, I mean, if he's transferring his rights, the ownership rights, essentially, right? Everything, the title. Yes, ma'am. Did they agree to that? Do they have to agree to that? I don't know that I know the answer to your question, quite truthfully, because clearly the documents are set up, the original planning and original documents are set up so that there would be a transfer of the associated, transfer of everything to the association to maintain all that. There is nothing in the record. You're saying the 1999 documents? The 1999 documents. Were set up so that ultimately the lake, et cetera, would all be transferred to the lot owners? Yes, ma'am. As an example, in all of the notes, or there are some of the notes, I guess, on the plan itself, that are off record, of course, show that the easements are going to be maintained by the lot owner of the homeowners association. All improvements outside the right of way shall be the responsibility of the homeowners association and so forth. So there's several references to the homeowners association and the duties they have to maintain this common interest community. In the original plan? In the original plan. Yes, ma'am. Okay. So what you have then is a transfer. There is nothing in the record that would indicate an acceptance. I would tell you there was an acceptance simply by the way the events then transpired and the evidence in the record that showed that there was a homeowners association form, that they held meetings, that they passed bylaws, that they amended those bylaws on two different occasions, one in 2005 and one in 2010, and that, quite truthfully, six of the eight defendants served as officers or committee members on the various committees of the association itself. But there is nothing to show that there was an acceptance by all the homeowners or the lot owners? Of the 2001 restrictions? Of the 99 restrictions. There is nothing that needs to be signed by all the homeowners in the 99 restrictions. Okay, what about the 2000? Go ahead, finish up. I'm sorry, and I'll jump to your next question in a little bit. The law is very clear. I, as a landowner, can subdivide my land and put any restrictions on it I want. So if I come in as Ralph Waldocker and I say I'm going to develop a subdivision, I have to, of course, meet any of the zoning or planning requirements of the, not only of the plant app, but the use of packages I'm dealing with. And that was all done, and that's in the affidavit of Ralph Waldocker, that's part of the record. So he went through the process, recorded the final plan, and at that time recorded restrictions, saying these lots that I own, before I sell anything, are governed by these restrictions. So they bought subject to it? They bought subject to it. And that's in the affidavit of Maureen Donoville, who was the Thailand examiner, who went through and said, look, all of these deeds say the same thing. Your lot so-and-so of the Breyer subdivision, subject to all restrictions of record. Well, these are restrictions of record. So then you pass forward to 2001, which I believe is what your next question is going to be. And the developer himself, Ralph Waldocker, in the preparatory remarks in the appendix 189, says that he is the title holder and developer, and he desires to impose upon the premises certain easements, conditions, restrictions, reservations, and limitations, to meaning part of the plat. It was determined by him that the restrictions in 99 were inadequate and needed to be supplemented. As an example, and this is pretty much what led to the fight, a $50 assessment fee for maintaining the lake. And that was in 1999. If you just want to use simple common sense, okay, we've got inflation, $50. A year. $50 a year. Is it going to cover the lake maintenance, the insurance, the tennis court maintenance, the lighting, the common area expenses, the grass cutting? So he comes in and says, we have to do something different. And he had that right. He retained it. And the law is clear. All of the case law that has been cited by either party in here says the person who retains the right to amend restrictive covenants on a deed without the consent of the owner can't do it. And that's what happened here. Now, I know it's been argued, and Mr. Cronin, I'm sure, is going to point out, well, there's been this transfer and they have to have it once it's been transferred. That's not true. Even the cases they cited don't support that. The original developer, Ralph Walbacher, has the ability to change all of the restrictive covenants at any time he wants as long as he held an interest in the subdivision at the time that he was making the amendments. And that is the Fox Creek case that was cited by Mr. Cronin. Okay. Now, at the time he's making those amendments, what interest did he hold? He still owned several lots and he still owned all of the common areas. So the common areas got transferred out after the November 28, 2001 amendments were done. So he still held a significant interest. In fact, the restrictive covenants that he signed says, I'm signing these as a developer, which, truthfully, ends the conversation right there based upon the state of the law. He was a developer. He has the right to do it regardless of consent. Conversely, I will tell you, if he is going to try to change the entire plot and change, therefore, the nature of the community, he would have had to get everybody's signature who he had sold the lot to. But he wasn't changing the plot. So that is where I think the misnomer or the confusion comes in as to what is necessary. For the restrictive covenant and the right to change that, that was retained. And he did it. All of the cases that were cited by Mr. Cronin in his brief and relied upon by the circuit court all say the exact same thing. And that is, this guy, if the developer has the right to do it. Now, what they all turned on in their individual cases, either the Fairfield case or the Fairway case, the Orchard case, or even Fox Creek, was they went through and they said, okay, this declaration of restrictive covenants says, here's who has the authority to change the restrictive covenants. And then, factually, they determined, okay, so-and-so changed the restrictive covenants in this particular case. He was not one of the people who retained the right. It was not defined that way. In any event, the restrictive covenants further show that each and every one of the defendants, save two, signed the restrictive covenants anyway. They agreed to it. And if you want to say it from a factual standpoint, they agreed to the restrictions themselves. So it would apply to their lots regardless. Mr. Haney did not sign them. But again, he's covered by the developer. The porters were not involved at this point in time. They didn't even own a lot at this point in time. And over and above signing as the developer generically, he signed as the developer because he still owned these other lots, porters being one of them. So we literally go from November 28th of 2001 all the way up to 2013, roughly, where all of the dues are being paid. There are two special assessments that have been passed and paid by everybody. Everybody's cutting the grass the way you cut the grass. They're abiding by the tennis court rules, the lake rules, all of the things you would see in a common interest community. All of the neighbor is a neighbor. Until they decide to pass a special lake assessment to, of course, fix the lake. And that's where a big fight comes in because some of the non-lake owners were saying, oh, this lake doesn't benefit us. Well, the same could be said about the tennis court where people don't live on the tennis court. That tennis court don't benefit us. But it's the community. It's the common interest in that community as a whole that benefits everybody and benefits their real estate values. On top of that, each of the non-lake lot owners, if you will, in other words, their lot was not on the lake itself, had a common area lake access at the southwest corner of the lake. And that's clearly identified not only in the plaque, but it also in the affidavit of Mr. Waldocker. So they had an interest in the lake in and of itself. Whether or not they used it, different story. So this is what really starts the fight. So I submit to the court that there was, essentially the judge in the trial court made a mistake when he granted summary judgment. One, because clearly the developer had retained the right to change the restrictive covenants, and he clearly did so and specified it in the restrictive covenants, the 2001 restrictive covenants. Secondly, and perhaps alternatively, you can construe the recording of the 2001 restrictive covenants as implied restrictive covenants through a voluntary association if you had to go that route as well. Kind of an aside again, when did the developer digest himself of all of the common areas? It would have been shortly after November 28, 2001. Restrictive covenants were recorded. In fact, in part of his affidavit, he even says, look, we are selling lots. We're really selling. Now, this community is moving because of the restrictions we got in there, but we have to supplement them. And that's what the basis of the supplementation was. And I know there's a lot I even made of the case because it was the key case that the court relied upon and that Mr. Cronin cited, and that's at Exchange National Bank. And you got into this dichotomy about aggregating versus amending something. And I cited, of course, the Zito case that said amendments to restrictive covenants that would help set out a plan or design to fulfill the original intent of the restrictive covenants is perfectly valid. So that also goes to the fact that the lot owners, every owner did not need to sign the 2001 restrictive covenants. And the reason that is important is because if you look at the Exchange National Bank case, the 14 of the 25 lot owners literally said, we are going to take away the restriction on lots 9 and 10 for this church. It was a single-family restriction. We're going to take it away, totally abolish it, and we're going to let you build a church here. That's not what happened in this case. There was nothing taken away by, let's see, 46. There was roughly 8 that didn't sign. So, you know, 38 people, there was nothing taken away. They supplemented what was already there. They supplemented the scheme, the design. And this all goes to the implied covenant argument over and above the fact that, again, they didn't have to sign them in the first place. The corporate issue, I think, is truthfully a red herring, and I would just point out, again, kind of two things. One, the case that they cite clearly says, hey, look, you've got to follow the law. Don't have a problem with that. But it also says that we're going to let you, you are now, since you did follow the law, you're a voluntary association if you didn't incorporate properly. For as long as you need to become a corporation under the dockets. So that leads to the question, you know, perhaps in everybody's mind is, was the original vote that is uncontested by the affidavit of Rusty Wagner who said there was a unanimous vote there to incorporate? And that was what month? December 2, 2001. Okay. So there was a, you know, and I guess you have to vote to incorporate before you actually incorporate. So they voted in December. They started filing the paperwork. They filed the paperwork, and all the paperwork met the corporate formalities about, hey, this is who we are. We have our vote. Unanimous, we're moving on. And then, of course, you get into the next argument is, once that's incorporated, can they adopt the bylaws that they adopted? Because the bylaws are, in essence, a mirror image of the restricted covenants. So, and you can get into the corporate argument that not only does a voluntary association have inherent powers to conduct its duties that it's charged with, which is also cited in that Scott case, and it's actually in the Ripsage case that I cited. And since I'm pronouncing it very poorly, it is at 213 Illinois Ave. 3rd, 120319, or 989 Northeast 2nd, 752. So you've got the ability of the corporation to adopt the bylaws that they adopted. You've got the ability of the corporation to modify and confer. You've got to finish your thought, and then you've got rebuttal time. They basically grabbed the rap, I think. In short, you should reverse the judge's findings. The opportunity for rebuttal, and you're welcome. Mr. Cronin. Good morning, Your Honor. Good morning. As you said, my name is Sean Cronin. I represent all the appellees and defendants except the porters, but I would like to let the Court know that I spoke to counsel for the porters. Prior to the argument, he understood I was going to come here, and he said he was going to provide my argument, and we did file a joint brief for this matter because we have an identity of interest for the most part. I'm here today, may it please the Court, to request that the Court affirm the judgment of the lower court. Before addressing the judgment directly and the facts of the case, I think it's important to address some overarching legal principles that frame my argument and frame the latest one that perhaps needs to appear. First, that the law favors free and unobstructed use of property. Courts do not favor restrictions upon the utilization of land. It is a central tenet of a free society that there's a presumption there are no encumbrances on your private property unless you agree to both. For that reason, covenants are strictly construed against your actors, and those seeking to enforce covenants against private property owners. This comes down to an issue of contract. In addition to the inherent right to own property and control your property, in order to give that away, you have to do it by contract. That's the only way you can do it. And you can't be bound contractually unless you're a signatory to that contract. You need mutuality, as the Court knows. And restrictions have to be unanimous and universal or else they don't make any sense. They have to bind everyone that's subject to them or else they bind no one. It's important to note that though we're calling these restrictions, we talk about the 1999 restrictions, the 2001 restrictions, there's a big distinction between restrictions on the use of property, like zoning restrictions, set-offs from the street, how many bushes you can have in your front yard, whether or not you can have a shed, stuff like that, and the restrictions that plaintiffs are trying to enforce here. And that is the power to tax and levy assessments on private property, which includes the power to place liens on that private property. And in the 2001 restrictions, and according to Illinois law, you also have the power to use the Forceful Entry and Detainer Act to enforce those liens and collect those tax levies. You're saying that you don't have that power under a covenant and restrictions to assess fees? I'm making a distinction between the power to assess fees and a simple restrictive covenant on the use of land. And that distinction becomes very important when we talk about the 1999 restrictions and the 2001 restrictions. And I think the power to tell someone whether or not they can have an outbuilding and the power to assess taxes and fees and dues on their property and lien up that property and then foreclose that property are entirely different powers. And because in HOA, if it's properly incorporated, that has bylaws that says they can assess taxes and fees, lien up your property, or close your property, because those are such awesome powers, we require strict compliance with the formalities of the applicable statutes and of contract law, which states that everybody has to sign those. The government can't impose taxes without the consent of the people. So just in practicalities, we started with a $50 assessment, right? I acknowledge, Your Honor, that the 1999 restrictions included, I believe, a right by someone to impose a $50 assessment. But, Judge, as we set forth in our brief, we don't think the 1999 restrictions are valid enforceable either. Okay. And under your, what you propose is that the law is that in order for a homeowners association to assess a fee or change a fee, it would have to, everyone would have to be in agreement to that? Absolutely, Your Honor. So, in other words, if you have a subdivision that's on a lake and the dam breaks and there's 45 houses and 44 of them say, yes, we need to repair the dam, and the one homeowner says no, they can't do it? They can't assess a fee? Well, I think it depends on what the relationship is between the homeowners, Your Honor. And I think just presupposing that there is a valid homeowners association in your hypothetical, and that there are valid restrictions that address how to take care of maybe a common area like a lake, I would say without those things, the common law of property addresses all these issues. There are repairing rights for lakes. There are issues of easement, nuisance. There are zoning laws in state and local government. The property exists outside of HOAs and restrictive covenants as a matter of law presumptively. You have to agree to put these restrictions on your property, and you have to agree with other people unanimously to have a group agreement about how you govern your property and whether or not you can all agree to be taxed and paid for collectively. I mean, you can write an HOA where you agree to live on a commune, but it has to be unanimously agreed to. And I don't have that in front of me, but I thought Mr. Dowling was saying the original plat had an agreement to maintain the common areas. Was that correct or not? No, I disagree with that, Your Honor. The original plat was filed setting forth a subdivision and had a lake, and it showed different plots of land on it, 48 of them I think there were. And then separately from that plat, there was filed a document called the 1999 restrictions. Notably, those restrictions are not signed by anyone, and they don't even reference the subdivision plat that he refers to. So it's a document that's recorded that doesn't reference the subdivision that isn't signed. And that document, the 1999 restrictions, not only is it not signed by any of the homeowners or the developer, it does not say that you can have special assessments for lake improvements. It does not say you can lien on someone's property. It does not say that you can foreclose on somebody's property for those liens. So the lower court found as a threshold matter that the 1999 restrictions were invalid, and even if they were, Judge McGlynn held at a motion to dismiss order prior to the motion for summary judgment and the judgment issued pursuant to that, that the 1999 restrictions did not contain the provisions and the restrictions that plans seek to enforce here. So but for the 2001 restrictions, the court held, and it has not been appealed at the motion to dismiss stage, that the 1999 restrictions don't contain the provisions they seek to enforce. They do not provide the homeowners association, if it existed, the right to levy assessments and lien on property to collect them. And I guess that brings us to the recitation of the facts. So the 1999 plat was not signed. I'm sorry, the restrictions. They didn't reference the plat. It did not create a right to create a homeowners association nor did it create a mechanism to create that. Therefore, there's no foundational document to support the creation of a homeowners association in the 1999 restrictions. There are no power of levy to assess taxes, special assessments of the late, as the court found in the motion to dismiss, sorry, the order on dismissal, and that has not been appealed. Subsequent to those 1999 restrictions, almost all of the property owners purchased their property. There were no 2001 restrictions. At some point, as Mr. Gowling acknowledged, the developer says he thought that the 1999 restrictions were inadequate, which is telling, and that they needed to be supplemented. He filed those with the recorder. What do you mean by it's telling? Well, as I said. I'm just trying to flush this out. Sure, sure. Because the lower court found that the 1999 restrictions don't contain the provisions and rights that plaintiffs seek to enforce, he keeps going back to the 1999 restrictions because I think he thinks it has merit that those were on file and recorded prior to the homeowners purchasing their properties, and therefore they have notice. But that's immaterial because the 1999 restrictions don't contain the provisions he seeks to enforce. And in 2001, the developer must have realized that because he said these are inadequate. I need to supplement them. And then he filed the 2001 restrictions, which arguably, Mr. Gowling says, finally do contain the power to assess taxes and lien on property and foreclose upon it. The problem is these are people that own private property in the fee system. You cannot just impose upon them because you used to be the developer of the property that sold the property to you. It would be simple. Suddenly I've decided I want to have all new restrictions. It includes the power for all your neighbors to levy taxes against you and lien up your property, and it can be in any amount that anybody wants. The law is very clear in the exchange case that in order to have restrictions like that, including these broad powers to levy a special assessment, everyone has to agree. It is a bedrock principle of contract law and the right to control your own property. It's also telling that Mr. Gowling said most of the property owners signed the 2001 restrictions. If you look at them and they're in the appendix, there is a signature block for every single property owner and the developer and the seller next to it. Most of them are signed, but not all of them are signed. There's a reason he put signature blocks for every single one of them. It presupposes he understood that everybody had to sign it and that it would be enforceable, and the exchange case is very clear on that point. Mr. Gowling tries to make a distinction between abrogation of restrictions and the amendment or passing of new restrictions, and, Judge, there is no basis for that distinction. It is a distinction without merit. The court doesn't make that distinction. In fact, the court in exchange uses the words amendment and modification as well as the word abrogation, and if you take Mr. Gowling's argument to the next logical step, what he's implying is he's admitting you need 100% of the people that are affected by the restrictions to sign the contract, to take away restrictions, to abrogate them. But the corollary is he's saying, but you don't need anybody's signature to institute new ones or amend them and take away rights from them. And that's not what the court meant, and it doesn't logically make any sense. So it's undisputed that not all law owners signed the 2001 restrictions, and that alone is dispositive. That's what exchange says. That's what the law is. You can't have new restrictions on your property that include the right to have assessments levied against you without signing off and agreeing to those in writing. This is real estate, Your Honor. The statute of frauds applies to all of these transactions. You need something signed in writing. These shouldn't be enforced any more than the court would enforce an unsigned mortgage. Just because someone says, well, I couldn't believe they knew about it, you should enforce it. It's real estate, you have a statute of frauds, that's the law of the land. It's also notable that the Homeowners Association did not exist at the time the 2001 restrictions were unilaterally filed and entered by the developers. Well, it existed, but not as an incorporation. I mean, you're saying it can't exist? Correct, Your Honor. It cannot exist. It's a creature of statute, and you have to strictly comply with requirements to create a corporation like any corporation. Illinois has a non-for-profit corporation act. It's virtually the same as the for-profit corporation act in terms of requirements to create it. But for strict compliance with those requirements, it does not exist. After the 2001 restrictions were allegedly recorded without the signatures of all the property owners, they then a month later, in December 2001, I believe, purportedly passed bylaws for Homeowners Association that statutorily technically did not exist. Those bylaws, which are also in the appendix, those were not signed either.  that lives in the property. Nor was there a Homeowners Association in existence to create the bylaws. Any more than a for-profit corporation, AT&T, could create bylaws before it technically exists and complied with the statutory requirements to create itself. So the bylaws, which are the only mechanism by which a Homeowners Association could effectuate its terms, can effectuate levying assessments, are null and void, and that's what the lower court found because the HOA didn't exist when they were passed. Then, a year later, I'm sorry, in February 2002, let's say three months later, someone must have realized they didn't do it right, and they went and they tried to file articles of incorporation to create the HOA. Unfortunately, they didn't comply with the statutory requirements at that time either, which said to create a HOA, you have to have a valid foundational document that gives you the express right to create this HOA for a particular subdivision. That does not exist here. The 1999 restrictions don't create that right. They don't have a mechanism for creating a Homeowners Association. The 2001 restrictions are not signed by everybody, so they're invalid and null as a matter of law. When they filed the articles of incorporation without a foundational document, those are null and void, and it never existed. Furthermore, the strict requirements of the statute under the Illinois Not-for-Profit Corporation Act say that when you file that, you have to file something that says 100% of the people that live here signed off on this and agreed to it and provide evidence of that. And that wasn't included in the articles of incorporation either. It's a de facto deficiency as a matter of law, and it means the HOA never technically, legally existed. So, Judge, there was no 1999 restrictions that gave the property owners, the plaintiffs, or anyone else the right to levy assessments, to lien a property, to collect those assessments, or foreclose on the property. The 2001 restrictions are null and void as a matter of law because they weren't signed by everybody, and it's the only way you can contract away your rights to control your own property. Mr. Dowling makes a lot of hay about his allegation that the 1999 restrictions included a retention of a right by the developer. The case law is very clear in Fairways and County Lakes and Lake Hills Property that a developer, though he may retain a right to amend some restrictions, he only has that right as long as he owns the subject property. Once you sell a parcel of property, anything simple to a private homeowner, that right is extinguished. You can't come back and say, gotcha, I withheld this right to forever change the restrictions on your property, which includes my right to assess taxes and fees, and I've decided to change them dramatically, even though you've never agreed to that. Fox Lake Hills is very, very clear. Fairways and County Lakes, which is the central case, says, once the title to the property passes from the hands of one holding such a reservation of right to unilaterally modify, the power can no longer be exercised by him or any other person. The Fox Lake Hills case is exactly consistent with the other case, except for in that case, the reservation of right was incredibly clear. In that case, the developer reserved the right to, from time to time, hereafter, to alter, change, modify, revoke, delete, import, or impart any or all of the restrictions, covenants, and conditions above set forth in the Containment Declaration of Restrictions filed above record in the subdivision plaque. We don't have anything approaching that level of specificity here. Here, the 1999 restrictions look like a page and a half. Say, I reserve the right to amend restrictions from time to time. I thought you said that there wasn't any restrictions in the 1999, that it was just a document that wasn't signed by the developer or anyone else. Your Honor, I agree, and I'm making an alternative argument. I'm just addressing Mr. Dowling's argument that contained within that was a reservation of the right to create the 2001 restrictions. I disagree. It wasn't signed. And it didn't refer to a plaque. It did have a line in it that said, as a developer, I reserve the right to amend these restrictions from time to time on a lot-by-lot basis. Assuming, argumento, that the 1999 restrictions were valid and enforceable, such a reservation is not valid and enforceable once you sell plans to private citizens, it would be simple. And the way it's written, I reserve this from time to time on a lot-by-lot basis, does not mean, and this is what the lower court held, on an en masse basis. That you can just do it unilaterally for every single piece of property in the subdivision. So if he had that right, then he could change it, make amendments prior to the sale of the individual lot, is what you're saying. If, indeed, he had the right reserved. Not afterwards and not to anybody else. I don't disagree with that, Your Honor. That hasn't been briefed in it and that wasn't an issue on appeal. But I guess, hypothetically, if you had a valid restriction, restricted document, that reserved such a right to the developer and was properly drafted, and he hadn't sold any of the lots, I wouldn't disagree that he would have the power to change the restrictions. He owns the whole thing. I would not disagree with that. But that's not what happened here. And in the Fox Lake Hills Property Association case, where there's a much clearer reservation of rights, arguably, as written, more enforceable than what we have here, they still said that his right extinguished as soon as he transferred the property. That just is the law of the land and there's no way around that, frankly. Those cases are not distinguishable from our case in any meaningful sense. Mr. Downing addressed the concept of implied restrictions. I understand he's pleading the alternative, but it's also telling because he has to get to the concept of implied restrictions because it's so clear that we don't have contractual express restrictions that are enforceable here that provide the relief that his clients are seeking. The problem is for implied restrictions, first, that they're not... You can't have implied restrictions enforceable by a homeowner's association. The law of implied restrictions is that a landowner may have an equitable right to enforce a restrictive covenant on another landowner. This is not an equitable right that a homeowner's association would have. Even so, it's a very narrow, equitable exception to the cause of action. And there are elements you have to prove to establish that. One is, the restrictions were included in all the deeds. We do not have that right. The 2001 restrictions weren't even recorded until after most of the property was sold to my clients. Another is, notice of the restrictions was given to an in-recorded file of the subdivision when purchased. Again, the 2001 restrictions are the ones that contain the provisions they seek to enforce. And those did not exist, and they were not recorded when my clients purchased their property. So they weren't on notice of it, either. The Cougar versus... I think your time may have expired. You can finish your thought, and that's it. Your Honor, we ask that you uphold the judgment of the lower court. Thank you, Mr. Grumman. Mr. Dalling, you have rebuttal. Okay. In the appendix at 180 is the plat. Page 8181 is the second page of the plat. The first page will have the notes, and you're really going to need probably a telescope as opposed to a magnifying glass to read the fine print. But you'll notice on page 1... I'm sorry, it's 182. In the lower right-hand corner of the page 2 of the plat says, Restrictions Attached, and it has a document, page number, and book number. And then, of course, on 183 and 184 of the appendix, are the, in fact, the 1999 restrictions. What Mr. Crowman attempts to do, in truth, is a total mischaracterization of the basic property law. I, as a landowner, have the right to put any restrictions on my property as I want, without the consent of anybody else I may sell it to in the future. And that's the situation you have here. Mr. Wildocker came in. He subdivided this land into 46 lots. He filed his restrictions. And, yes, there is a spot for the seller, buyer, and buyer. However, on June 3, 1999, there were no people that were selling or buying lots yet. This is a form that he was going to use down the road in the sales techniques. Paragraph 35 of that particular form... So, excuse me, are you saying then that when each individual lot was sold that there was this attached? That this was part of their deed? There is not that in the record. I believe there is some reference in the record from Mr. Wildocker's affidavit that says he sold lots. He was sold on that. But it's on their title policy in any event. It is on their title policy? Absolutely. And Maureen Donahoe's affidavit identifies each person's warranty deed that was issued to them, shows the exceptions, it has a title commitment for it, and it shows restrictions of record. And it references the book and page number and this document number for the 1999 restrictions if you bought it prior to January 28, 2001. And as for the porters who bought it after November 28, 2001, it would have referenced that particular thing. But again, it is a reference to the restrictions that were recorded at the time. Okay. So, excuse me. Since there's 42 restrictions, can you point me to the ones that you think are germane? Well, the truth of that, I'll probably tell you all 42 of them. Well, please don't. Well, and it kind of goes to, I mean, here you have in, I believe, paragraph 17, you have references to the Landowners Association. You mentioned about taking care of the urban dam and maintaining the, preventing the deterioration. You've got paragraph 19, which is the $50 annual fee to be paid to Landowners Association for the upkeep and the grounds, including not limited to subdivision interest dam and common areas. Paragraph 35, obviously, is the right to amend the restrictions as needed, retained by the developer. And the developer, as long as he owns an interest, and this is even the Fox Hills case, you know, Mr. Cronin does not cite it properly. Fox Hills, Fairway, Orchards, every case that he cites in his brief clearly set forth the fact that the developer who retains the right to amend the restrictions can do so without the consent of the owners, as long as that developer, or whoever is defined as the developer or decrement of those restrictions, has an interest in the subdivision. It's not, I said it's not. You're saying that he can sell a lot, someone can buy it, and he can come up with any amendment he wants after that lot has been sold in fee simple. Absolutely, because even if you want to use Mr. Cronin's argument of a contract, when they bought the house, when they bought the lot, they bought it subject to the condition that I can change the restrictions any time I want on an as-needed basis. That was the contract they got. All of the case law on deeds and property sales and conveyances is very clear on this point. So in 1999, I did that. 2001, I amended it. And the reason I said, if you look at all 42 of them, and if you were to sit there and compare them to the 2001 restrictions, they are amplifications of what is here in the original 99 restrictions. No further signatures were needed. Again, I ask you simply to reverse the decision of the trial court, find that the 99s as well as the 2001s are valid and enforceable. Okay, thank you, gentlemen, for your briefs and arguments. And before you depart, because I need to put something on the record that we're missing one of our panel members. He took ill, nothing real serious, but wasn't able to be here, and it's Justice Goldenberg. And as everyone present here knows, the arguments are available orally, and he will, of course, have the opportunity to hear those and will hear those and has the records and briefs. So with that said, we'll take the matter under advisement and under ruling. Thank you. We're going to take a brief recess.